# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re: Subpoena of DJO, LLC in the matter of<br><br>ORTHOFIX, INC.,<br>    Plaintiff/Counter-Defendant,<br>v.<br>ERIC W. HUNTER,<br>    Defendant/Counter-Plaintiff.<br><br>In re: Subpoena of DJO, LLC in the matter of<br><br>ORTHOFIX, INC.,<br>    Plaintiff/Counter-Defendant,<br>v.<br>ROBERT LEMANSKI,<br>    Defendant/Counter-Plaintiff. | Case No.  13CV2004-MMA(JMA)<br>              13CV2268-MMA(JMA)<br><br>**ORDER GRANTING IN PART AND DENYING IN PART NON-PARTY DJO, LLC'S MOTIONS TO QUASH SUBPOENAS** |

Non-party DJO, LLC ("DJO") has filed two motions to quash in relation to two subpoenas that were issued by Plaintiff Orthofix, Inc.

("Orthofix") in connection with two lawsuits initiated by Orthofix against its former, and DJO's current, employees Eric W. Hunter ("Hunter") and Robert Lemanski ("Lemanski"). The litigation against Hunter is pending in the United States District Court, Northern District of Ohio, Western Division, *Orthofix, Inc. v. Hunter*, Case No. 13-CV-828-JZ ("the *Hunter* case"). The case against Lemanski is pending in the United States District Court, Eastern District of Michigan, Southern Division, *Orthofix, Inc. v. Lemanski*, Case No. 13-CV-11421-SJM-RSW ("the *Lemanski* case"). The subpoenas were issued out of the United States District Court, Southern District of California by counsel for Orthofix and command DJO to produce and permit inspection of certain documents.

After the motions to quash were filed, counsel for Orthofix and DJO were ordered to meet and confer regarding all disputed issues and, if the meet and confer did not resolve all issues, with respect to the *Hunter* case, to file a joint statement entitled "Joint Supplemental Statement Regarding Corrected and Amended Motion to Quash Subpoena" ("Joint Statement') informing the Court as to which issues remained in dispute. Briefing for the Motion to Quash the subpoena issued in connection with the *Hunter* case consists of: DJO's Corrected and Amended Partial Motion to Quash [*Orthofix, Inc. v. Hunter*, Case No. 13CV2004-MMA(JMA) (S.D. Cal.), Doc. No. 2]; Orthofix's Opposition [*Id.*, Doc. No. 6]; DJO's Reply [*Id.*, Doc. No. 7]; and the parties' Joint Statement [*Id.*, Doc. No. 10]. With respect to the *Lemanski* case, counsel were ordered to file a Joint Motion for Determination of Discovery Dispute ("Joint Motion"), which addresses all remaining disputed issues and supercedes DJO's Motion to Quash Subpoena. [*Orthofix., Inc. v. Lemanski*, Case No. 13CV2268-MMA(JMA) (S.D. Cal.), Doc. No. 7.] As explained in the Joint Statement and Joint Motion, counsel have substantially narrowed the scope of the disputed

issues through the meet and confer process; however, Orthofix and DJO were not able to reach agreement on three of the document requests in Orthofix's Subpoenas: Requests Nos. 1, 7, and 9. [13CV2004-MMA(JMA) (S.D. Cal.), Doc. No. 10; 13CV2268-MMA(JMA) (S.D. Cal.), Doc. No. 7 & 7-1.]

## I.  FACTUAL & PROCEDURAL BACKGROUND

Hunter and Lemanski are former employees of Orthofix, and are alleged to have sold bone-growth stimulators on behalf of Orthofix for a combined nineteen years. These products help patients recover after surgery by helping fractures to fuse more quickly. They are used by a specialized subset of surgeons on a small portion of their patients based on the unique prescribing criteria established by a given surgeon in consultation with Orthofix sales representatives like Hunter and Lemanski. Orthofix claims that since Hunter and Lemanski departed the company, it has suffered a drastic loss of sales of these products, reaching into the millions of dollars. Orthofix believes these sales have been redirected to DJO by Hunter and Lemanski using their knowledge of Orthofix's customers, including purchasing histories, product preferences and prescription patterns they obtained while employed by Orthofix. Orthofix contends that in order to conceal the violations of their contractual and common law duties, Hunter and Lemanski ostensibly sell other DJO products while introducing other DJO employees to their respective former Orthofix customers, and while sharing Orthofix's confidential and trade secret customer information with the other DJO employees, who then receive the credit for the bone-growth stimulator sales.

In the *Hunter* and *Lemanski* cases, Orthofix alleges its former employees breached agreements each entered into when they became Orthofix employees. Hunter signed an Agreement of Non-Competition,

Confidential Information, Inventions ("the Hunter Agreement"), which was entered into on March 20, 2000. [13CV2004-MMA(JMA) (S.D. Cal.), Doc. No. 2-3] The Hunter Agreement, as reformed by the Northern District of Ohio, provides that, for one year after he leaves Orthofix, Hunter will not "directly or indirectly, solicit sales on behalf of, or assist another in soliciting sales on behalf of any enterprise or individual engaged in production of equipment for or rendering the service of invasive or non-invasive spine or bone healing, within a 100 mile radius of [Hunter]'s home."[1] [13-CV-828-JZ (N.D. Ohio), Doc. No. 47.] The Hunter Agreement also prohibits Hunter from using confidential information that was acquired during the course of his employment after his separation from Orthofix. [13CV2004-MMA(JMA) (S.D. Cal.), Doc. No. 2-3, Art. 2.] The Sales Agreement ("the Lemanski Agreement") entered into by Lemanski is dated March 13, 2006 and prohibits Lemanski from directly or indirectly soliciting his former Orthofix customers and from disclosing or using Orthofix's confidential information and trade secrets after his departure. [13CV2268-MMA(JMA) (S.D. Cal.), Doc. No. 7 & 7-1.]

In the *Hunter* case, Orthofix has asserted causes of action for breaches of the non-compete and non-disclosure provisions of the Hunter Agreement, as well as misappropriation of trade secrets and tortious interference with business relations. [13-CV-828-JZ (N.D. Ohio), Doc. No. 24 (First Amended Complaint).] In the *Lemanski* case, Orthofix's causes of action are for breaches of the unfair competition, non-solicitation and non-disclosure provisions of the Lemanski Agreement, as well as misappropriation of trade secrets and tortious interference with business

---

[1] This provision (the "Restrictive Covenant") was originally silent on both scope of geographic reach and scope of prohibited activity. As originally written, the Restrictive Covenant would prohibit Hunter from engaging in any job for any competitor anywhere in the world. On October 21, 2013, however, the Northern District of Ohio reformed the Hunter Agreement prusuant to the parties' Agreed Order.

relations. [13-CV-11421-SJM-RSW (E.D. Mich.), Doc. No. 9 (First Amended Complaint).]

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 45 governs discovery of non-parties by subpoena. *See* Fed. R. Civ. P. 45. A non-party witness is subject to the same scope of discovery under Rule 45 as a party is under Rule 34. See Fed. R. Civ. P. 45 (Advisory Committee's note to the 1970 amendments). Under Rule 34, the rule governing the production of documents between parties, the proper scope of discovery is as specified in Rule 26(b). Fed. R. Civ. P. 34. Rule 26(b), in turn, permits the discovery of any non-privileged material "relevant to any party's claim or defense...." Fed. R. Civ. P 26(b)(1). Relevance, for the purposes of discovery, is defined broadly and "[r]elevant information need not be admissible at trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." *Id.*

In addition to the discovery standards under Rule 26 that are incorporated by Rule 45, Rule 45 itself provides that "on timely motion, the court for the district where compliance is required must quash or modify a subpoena that... subjects a person to undue burden." Fed. R. Civ. P. 45(d)(3)(A)(iv). In determining whether a subpoena poses an undue burden, courts "weigh the burden to the subpoenaed party against the value of the information to the serving party." *Travelers Indem. Co.v. Metropolitan Life Insur. Co.*, 288 F.R.D. 111, 113 (D. Conn. 2005); *Moon v. SCP Pool Corp.*, 232 F.R.D. 633, 637 (C.D. Cal. 2005). Generally, this requires consideration of "relevance, the need of the party for the documents, the breadth of the document request, the time period covered by it, the particularity with which the documents are described and the

/ /

burden imposed." *Id.* (*quoting United States v. IBM*, 83 F.R.D. 97, 104 (S.D.N.Y. 1979)).

Rule 45(d)(3)(B)(i) also permits the Court to quash or modify the subpoena if it requires disclosing a trade secret or other confidential research, development, or commercial information. Once the nonparty shows that the requested information is a trade secret or confidential commercial information, the burden shifts to the requesting party to show a "substantial need for the testimony or material that cannot be otherwise met without undue hardship; and ensures that subpoenaed person will be reasonably compensated." Rule 45(d)(3)(C)(i)&(ii). Upon such a showing, the court may order appearance or production under specified conditions. *Id. See also Klay v. Humana*, 425 F.3d 977, 983 (11th Cir. 2005); *Heat & Control, Inc. v. Hester Industries, Inc.*, 785 F.2d 1017, 1025 (Fed. Cir. 1986). Trade secret or commercially sensitive information must be "important proprietary information" and the party challenging the subpoena must make "a strong showing that it has historically sought to maintain the confidentiality of this information." *Compaq Computer Corp. v. Packard Bell Elec., Inc.*, 163 F.R.D. 329, 338 (N.D. Cal. 1995).

## III. DISCUSSION

The subpoenas issued in the *Hunter* and *Lemanski* cases are virtually identical. Other than the substitution of the name "Lemanski" for the name "Hunter," the document requests in the two subpoenas are identical. Likewise, the dispute between Orthofix and DJO as to each document request is the same, so the Court will address both subpoenas together.

### A. *Request No. 1*

Request No. 1 of the Subpoenas calls for:

> Documents, including commission reports, reflecting the total monthly sales made to the customers on the list attached

6

> hereto as Attachment 1, identified by product model name and number and sales representative(s), from January 1, 2011 to the present.

Attachment 1 to the respective subpoenas is a list of 73 persons and entities and is designated by Orthofix as "Confidential – Subject to Protective Order." The lists attached to the subpoenas are identical.

DJO contends its sales records are confidential and proprietary trade secrets. [13CV2268-MMA(JMA) (S.D. Cal.), Doc. No. 7-3 (Affidavit of Jeffery Blazevich), ¶ 7.] As detailed in that affidavit, "[t]he type of sales records sought by Request 1 are documents that DJO maintains in confidence and does not publicly disclose." *Id.* Orthofix does not dispute these are sensitive and confidential documents.

Because the sales records are confidential, the burden shifts to Orthofix to show a 'substantial need' for this information. *Gonzales v. Google, Inc.*, 234 F.R.D. 674, 684 (N.D. Cal. 2006). Orthofix argues it needs the requested sales records because DJO has structured Lemanski's role such that he has called on his former Orthofix customers along with another DJO employee who acts as the salesperson of record. [13CV2268-MMA(JMA) (S.D. Cal.), Doc. No. 7, p. 7.] Sales conducted in this manner would violate Lemanski's contractual prohibition against indirectly soliciting his former customers but would not be reflected in his commission records, the only sales records DJO has agreed to produce. Hunter is also alleged to have contacted his former Orthofix customers and to have shared Orthofix's confidential and proprietary information and trade secrets with other DJO employees in order for them to assist him in stealing the customers. [13CV2004-MMA(JMA) (S.D. Cal.), Doc. No. 6, p. 6.]

Orthofix seeks the sales records because evidence of Hunter's and Lemanski's alleged solicitation of their former Orthofix customers and

7

disclosure or use of Orthofix's confidential information and trade secrets would be reflected by changes in DJO's total sales of bone-growth stimulators to their former Orthofix customers from the periods before and after they joined DJO. Increases in DJO's sales to these accounts, coupled with the drastic decreases in Orthofix's sales, Orthofix argues, are strong evidence of Hunter's and Lemanski's solicitation of their former Orthofix customers and/or their disclosure of Orthofix's confidential information to allow others to do so.

DJO has agreed to produce commission reports reflecting Hunter's and Lemanski's sales of products to their respective former customers for the period November 14, 2012 (the date they both commenced employment with DJO) to the present, but contends the request is overbroad in that: 1) it seeks all of DJO's sales records for 73 persons and entities, regardless of whether Hunter or Lemanski were involved in those sales, and regardless of whether either man ever called on those customers for Orthofix; and 2) it seeks records dating back to January 2011 – nearly two years before Hunter and Lemanski began working for DJO.

With respect to DJO's first objection, records of sales to customers who were serviced by Hunter or Lemanski while they were employed with Orthofix are clearly relevant to Orthofix's claims. This includes DJO's records of sales to Hunter's or Lemanski's former Orthofix customers, irrespective of whether either Hunter or Lemanski received a commission or other credit for the sale made by DJO, as these records are relevant to Orthofix's claim that Hunter and Lemanski violated the contractual prohibition against directly *or indirectly* soliciting their former customers. DJO claims, however, the list of 73 persons and entities for which records are sought in connection with the *Lemanski* case includes Orthofix customers with which Lemanski was not involved. The same argument is

raised with respect to the *Hunter* subpoena. Orthofix does not respond to the distinction drawn by DJO between customers with whom Hunter and Lemanski were involved on behalf of Orthofix, as those with whom they were not. Instead, Orthofix simply offers arguments directed to establishing the relevance and need for discovery as to Hunter's and Lemanski's former Orthofix customers. [See e.g. 13CV2268-MMA(JMA) (S.D. Cal.), Doc. No. 7, pp. 6-8.] The request, therefore, is overbroad to the extent it calls for records of persons or entities with which Lemanski was not involved in sales on behalf of Orthofix, as Orthofix has not shown a substantial need for this information. The same analysis and conclusion applies to records of sales to customers with which Hunter was not involved while he was employed by Orthofix.

As for Orthofix's request for sales records that precede Hunter's and Lemanski's employment with DJO, these records are needed in order to evaluate whether DJO experienced a change in sales of bone-growth stimulators to Hunter's and Lemanski's former Orthofix customers after they joined DJO; these records are necessary for the before and after comparison to determine whether DJO's sales to these customers increased after Hunter and Lemanski came on board. DJO argues Orthofix's request for sales records that precede Hunter's and Lemanski's employment with DJO is a "fishing expedition." As the court in *Northwestern Mem'l Hosp. v. Ashcroft* colorfully noted, however, "and of course, pretrial discovery is a fishing expedition and one can't know what one has caught until one fishes [b]ut Fed.R.Civ.P. 45(c) allows the fish to object, and when they do so the fisherman has to come up with more...." *Gonzalez*, 234 F.R.D. 674, *quoting Northwestern Mem'l Hosp. v. Ashcroft,* 362 F.3d at 931 (7th Cir. 2004). Here, Orthofix has shown a substantial

/ /

9

need for records of sales that were made prior to Hunter's and Lemanski's employment with DJO such that it will be permitted to "fish" in these waters.

**B.     *Request No. 7***

Request No. 7 calls for:

> All sold order or other contracts or agreements between DJO and any of the following entities or anyone associated with these entities that were in effect from January 1, 2011 to the present:
>
> (a) St. Ann's Hospital – Toledo, Ohio
> (b) St. Vincent's Hospital – Toledo, Ohio
> (c) St. Charles Hospital – Toledo, Ohio
> (d) Wood County Hospital – Bowling Green, Ohio
> (e) Promedica Orthopedic and Spine Hospital – Toledo, Ohio
> (f) Toledo Hospital – Toledo, Ohio
> (g) Flower Hospital – Sylvania, Ohio
> (h) St. Luke's Hospital – Toledo, Ohio
> (i) Orthopedic Institute of Ohio – Lima, Ohio

Orthofix subsequently agreed to narrow this request to only those agreements that have been amended or replaced since Hunter and Lemanski joined DJO, plus the previous version of any such agreements. DJO maintains that even with this limitation the request is overbroad because it seeks documents that pre-date Hunter's and Lemanski's employment with DJO. Orthofix, it claims, has no substantial need to learn what pricing and other confidential terms DJO negotiated with hospitals without Hunter's and Lemanski's involvement, and to the extent Hunter and Lemanski were involved in making sales on behalf of DJO to hospitals they serviced while at Orthofix, this information would be disclosed in documents produced in response to Request No. 1.

Hunter and Lemanski helped negotiate sold-order agreements with customers while employed with Orthofix. Orthofix contends the defendants used the confidential and trade secret information regarding this negotiating process they acquired from Orthofix, including the specific terms and pricing contained in these agreements and Orthofix's pricing

strategies, to help DJO negotiate sold-order agreements with many of their former Orthofix customers. Like changes in sales, changes in sold-order agreement terms could provide evidence of Hunter's and Lemanski's alleged use and disclosure of Orthofix's confidential information and trade secrets. The only way to evaluate whether Hunter and Lemanski used Orthofix's terms and pricing strategies to benefit DJO is to evaluate whether any changes in terms occurred after they joined DJO and, if so, what those changes were; therefore, documents pre-dating Hunter's and Lemanski's employment by DJO are relevant to Request No. 7, just as they are relevant to Request No. 1.

### C.  *Request No. 9*

Request No. 9 seeks "All 2011, 2012 and 2013 business plans, forecasts, sales projections, and comments regarding the customers on the list attached hereto as Attachment 1. According to DJO, "[t]hese documents are "among the most sensitive competitive documents that DJO creates... [and] provide a virtual blueprint to DJO's competitive activities." [13CV2268-MMA(JMA) (S.D. Cal.), Doc. No. 7-3, ¶ 11.]

Orthofix subsequently agreed to narrow this request to only those 2013 plans, forecasts and projections which reference the sale of competitive products to Hunter's and Lemanski's former Orthofix customers, plus any older versions which mention recruiting Hunter or Lemanski to join DJO. Orthofix contends these documents would provide strong evidence of Hunter's and Lemanski's solicitation of their former Orthofix customers and their disclosure of Orthofix's confidential information and trade secrets. This information, Orthofix argues, will prove the effect that Hunter's and Lemanski's solicitation, use and disclosure of Orthofix's confidential information and trade secrets has had on DJO's

//

11

sales, and changes in these projections will demonstrate the effects of their involvement.

Orthofix has not demonstrated a substantial need to justify compelling the disclosure of DJO's highly sensitive business projections to its competitor. The relevance of discovery about what DJO planned to do before Hunter and Lemanski joined, or what it plans to do going forward, is, at best, tangential to the issue of whether Hunter and Lemanski breached their non-compete agreements or misappropriated trade secrets. Request No. 9 of the subpoena to DJO is, therefore, quashed.

### D. *Document Production Is Contingent on a Resolution of Any Dispute Regarding Orthofix's Identification of its Trade Secrets*

DJO contends any discovery of documents that may be relevant to Orthofix's trade secret misappropriation claim is premature because in the *Lemanski* case, Lemanski contends Orthofix has not provided a sufficient identification of its trade secrets. Any questions as to whether Orthofix must identify its trade secrets with reasonable particularity prior to discovery and, if so, whether it has done so, are matters for the Eastern District of Michigan to resolve, assuming the parties are unable to do so. If this is a pending issue in the *Hunter* case, the same analysis and conclusion apply. The Court's order that DJO produce documents responsive to the subpoena is, therefore, contingent on the resolution of this issue, to the extent it exists, in the respective underlying actions.

### IV. **CONCLUSION**

As set forth above, DJO's motions to quash Orthofix's subpoenas are granted in part with respect to Request No. 1. With respect to Request No. 1, the Hunter subpoena is quashed to the extent it calls for records of sales to persons or entities with which Hunter was not involved in sales on behalf of Orthofix. Request No. 1 of the Lemanski is also quashed to this extent.

DJO's motions to quash are denied with respect to Request No. 7, and granted in full with respect to Request No. 9.

DJO shall produce responsive documents within twenty-one calendar days of entry of this order, or within twenty-one calendar days of the resolution of any dispute between Hunter or Lemanski and Orthofix as to whether Orthofix must identify its trade secrets with reasonable particularity prior to discovery and, if so, whether it has done so.

**IT IS SO ORDERED**.

DATED:    January 15, 2014

Jan M. Adler
U.S. Magistrate Judge